## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| **THOMAS ROBERTS, ESQ., as Administrator and Personal Representative of the Estate of LINDA E. DORMAN, deceased 105 S. 1ST Street Richmond, VA 23219** | |
| **Plaintiff,** | Case No.   3:24-cv-737 |
| **v.** | |
| **BOAR'S HEAD PROVISIONS CO., INC.**1819 Main Street **Suite 800 Sarasota, FL 34236** | |
| <u>**SERVE:**</u>   **Corporation Service Company Registered Agent 100 Shockoe Slip, Floor 2 Richmond, VA 23219-4100** | |
| **Defendant.** | |

### COMPLAINT
### (Wrongful Death: Food Poisoning)

COMES NOW, Plaintiff Thomas Roberts, Esq., as Administrator and Personal Representative of the Estate of Linda Dorman ("Decedent"), deceased, by and through undersigned counsel, and respectfully move for judgment against Defendant Boar's Head Provisions Co., Inc. on the grounds and in the amount set forth below:

### JURISDICTION AND VENUE

1.   The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1332(a), since the matter in controversy far exceeds, exclusive of interests and costs, the sum of Seventy-Five Thousand Dollars ($75,000.00) and there is diversity of citizenship between Plaintiff and Defendant.

2. Venue is proper in this judicial district as the facts giving rise to Plaintiff's Complaint arose in this judicial district.

## PARTIES

3. Plaintiff is an adult resident of the Commonwealth of Virginia and was appointed the Personal Representative of the Estate of Linda Dorman, pursuant to an Order dated October 16, 2024, issued by the Circuit Court of Richmond County, Virginia (Exhibit 1).

4. Wrongful-death beneficiary Earl R. Dorman is and was always relevant a resident of the Commonwealth of Pennsylvania and is the surviving spouse of the Decedent, Linda Dorman.

5. Decedent, Linda Dorman, was at all relevant times prior to her death a resident of the Commonwealth of Pennsylvania.

6. Defendant Boar's Head Provisions Co., Inc. (Boar's Head) is a Florida corporation with its principal place of business located in Sarasota, Florida.  Defendant is, therefore, a citizen of the state of Florida. Defendant, however, is licensed to do business, and conducts business, in the Commonwealth of Virginia.

7. At all times relevant to this action, Defendant was engaged in the manufacture, distribution, and sale of a variety of food products to customers across the country, including deli meat.

8. At all times relevant to this action, defendant owned, operated and managed a Boar's Head plant in Jarratt, which is in Greensville County, Virginia.

## FACTS

9. Plaintiff repeats and realleges the prior allegations as if set forth herein.

10. This is an action against Defendant for injuries arising from the manufacture, distribution, and sale of contaminated food which was consumed by Decedent Linda Dorman and caused her

serious injuries and death and caused the surviving wrongful-death beneficiary to suffer the loss of his spouse; the loss of comfort, love, and guidance from her; the loss of services, protection, care, and assistance expected to be performed by her; extreme mental anguish, emotional pain, and grief; and financial expenses associated with the death of the Decedent, entitling Mr. Dorman to compensatory and punitive damages for these harms and losses and any and all other damages recoverable under the Commonwealth of Virginia's Wrongful Death Statute, VA. CODE § 8.01-50.

**The Boar's Head Listeria Outbreak**

11. As of September 25, a total of 59 people infected with the outbreak strain of *Listeria* have been reported from 19 states – Including: Arizona 1, Florida 3, Georgia 2, Illinois 1, Indiana 1, Louisiana 1, Maryland 8, Massachusetts 3, Minnesota 1, Missouri 3, New Jersey 6, New Mexico 1, New York 17, North Carolina 1, Pennsylvania 2, South Carolina 2, Tennessee 1, Virginia 4, and Wisconsin 1.

12. Sick people's blood and spinal fluid samples were collected from May 29, 2024, to August 28, 2024.  Of 57 people with information available, all 59 have been hospitalized. One person got sick during their pregnancy and remained pregnant after recovering. So far, ten deaths have been reported, including one in Illinois, one in New Jersey, one in Virginia, one in Florida, one in Tennessee, one in New Mexico, two in New York, and two in South Carolina.

13. Epidemiologic, laboratory, and traceback data show that Defendant's meats which are sliced at delis, including Boar's Head brand liverwurst, are contaminated with *Listeria* and are making people sick.

14. Defendant's products sold at delis, especially those sliced or prepared at the delis, can be contaminated with *Listeria*. *Listeria* spreads easily among deli equipment, surfaces, hands, and food. Refrigeration does not kill *Listeria*, but reheating to a high enough temperature before eating will kill

any germs that may be on these meats.

15.  Defendant published a recall of its deli meat products, including liverwurst and other deli meats, on July 26, 2024. The United States Department of Agriculture's Food Safety and Inspection Service (FSIS) announced that Defendant expanded its July 26, 2024, recall of deli meat products that may be adulterated with *Listeria monocytogenes* on July 30, 2024.[1] Defendant is recalling approximately 7 million additional pounds of ready-to-eat meat and poultry products. Whole genome sequencing results show that a sample of Defendant's liverwurst collected by the Maryland Department of Health tested positive for the outbreak strain of *Listeria monocytogenes*.

16.  This recall expansion includes 71 products produced between May 10, 2024, and July 29, 2024, under Defendant's Boar's Head and Old Country brand names. These items include meat intended for slicing at retail delis as well as some packaged meat and poultry products sold at retail locations. These products have "sell by" dates ranging from 29-JUL-2024 through 17-OCT-24.

17.  The products subject to recall were distributed to retail locations nationwide and some were exported to the Cayman Islands, Dominican Republic, Mexico, and Panama. The products shipped to retailers bear establishment number "EST. 12612" or "P-12612" inside the USDA mark of inspection on the product labels.

18.  The problem was discovered when FSIS was notified that a liverwurst sample collected by the Maryland Department of Health tested positive for *L. monocytogenes*. The Maryland Department of Health, in collaboration with the Baltimore City Health Department, collected an unopened liverwurst product from a retail store for testing as part of an outbreak investigation of *L. monocytogenes* infections. Further testing determined the product sample tested positive for the outbreak strain.

---

[1] https://www.fsis.usda.gov/recalls-alerts/boars-head-provisions-co--recalls-ready-eat-liverwurst-and-other-deli-meat-products

19. Beyond issues like paperwork lapses and leftover meat on equipment, the inspection records show inspectors faulted Defendant several times for mold and mildew building up in many locations throughout the company's facility in Jarratt, Virginia. In July, federal inspectors found what looked to be mold and mildew around the hand washing sinks for the workers tasked with handling meats that are supposed to be ready to eat. Mold was also found building up outside of steel vats used by the plant, as well as in holding coolers between the site's smokehouses. "A black mold like substance was seen throughout the room at the wall/concrete junction. As well as some caulking around brick/metal," an inspector wrote in January, noting that some spots were "as large as a quarter."

20. Other locations were found to have several issues with leaking and pooling water, including a puddle found with "a green algal growth" and condensation that was found to be "dripping over product being held."

21. After inspectors flagged one of the leaks to the company, workers tried to mop up the leaks. "The employee wiped a third time, and the leaks returned within 10 seconds," inspectors wrote after one condensation issue was raised on July 27, 2024, near fans that looked to be blowing the liquid onto uncovered deli meats.

22. In February, an inspector found "ample amounts of blood in puddles on the floor" and a "rancid smell" throughout a cooler used at the plant. Several records also flag sightings of insects in and around deli meats at the plant, including one instance that prompted the agency to tag more than 980 pounds of ham in a smokehouse hallway to be "retained" for an investigation.

23. In June, another report flagged concerns over flies going in and out of "vats of pickle" left by Defendant in a room. "Small flying gnat like insects were observed crawling on

the walls and flying around the room. The rooms walls had heavy meat buildup," the report notes. Other parts of the facility were also found to have bugs, including what looked to be "ants traveling down the wall," as well as a beetle and a cockroach.

**Listeria**

24. *Listeria* is a gram-positive, rod-shaped bacterium that is ubiquitous and can grow under either anaerobic (without oxygen) or aerobic (with oxygen) conditions.

25. Listeriosis is one of the most important bacterial infections worldwide that arises mainly from the consumption of contaminated food.[2] The disease is caused by *Listeria monocytogenes*, which is considered an opportunistic pathogen that affects mainly those with underlying immune conditions, such as pregnant women, neonates, and elders, resulting in septicemia, meningitis, and/or meningoencephalitis. Of the six species of *Listeria*, only *L. monocytogenes* causes disease in humans. It thrives between bacteria 86-98.6ºF (30-37ºC), but *Listeria* can grow at temperatures as low as $-0.4°C$ and survive in freezing conditions down to $-18°C$.[3] This unique quality allows thermal characteristics to be used as a means of differentiating *Listeria* from other possibly-contaminating bacteria.

26. *Listeria monocytogenes* is omnipresent in nature; it is found widely in such places as water, soil, infected animals, human and animal feces, raw and treated sewage, leafy vegetables, effluent from poultry and meat processing facilities, decaying corn and soybeans, improperly fermented silage, and raw (unpasteurized) milk.[4]

27. Foodborne listeriosis is relatively rare but is a serious disease with high fatality rates

---

[2]    Reda, W. W., Abdel-Moein, K., Hegazi, A., Mohamed, Y., & Abdel-Razik, K. (2016). Listeria monocytogenes: An emerging food-borne pathogen and its public health implications. *The Journal of Infection in Developing Countries*, *10*(02), 149-154. https://doi.org/10.3855/jidc.6616
[3]    Santos, T., Viala, D., Chambon, C., Esbelin, J., & Hébraud, M. (2019, May 24). *Listeria monocytogenes Biofilm Adaptation to Different Temperatures Seen Through Shotgun Proteomics*. https://www.frontiersin.org/articles/10.3389/fnut.2019.00089/full.

(20%–30%) compared with other foodborne microbial pathogens. Severe *L. monocytogenes* infections are responsible for high hospitalization rates (91%) among the most common foodborne pathogens, may cause sporadic cases or large outbreaks, and can persist in food-processing environments and multiply at refrigeration temperatures, making *L. monocytogenes* a significant public health concern.[5]

28. Ready-to-eat foods are a notable and consistent source of *Listeria*. For example, a research study done by the *Listeria* Study Group found that *L. monocytogenes* grew from at least one food specimen in the refrigerators of 64% of persons with a confirmed *Listeria* infection (79 of 123 patients), and in 11% of more than 2,000 food specimens collected in the study. Moreover, 33% of refrigerators (26 of 79) contained foods that grew the same strain with which the individual had been infected, a frequency much higher than would be expected by chance. The danger posed by the risk of *Listeria* in ready-to-eat meats prompted the USDA to declare the bacterium an adulterant in these kinds of meat products and, as a result, to adopt a zero-tolerance policy for the presence of this deadly pathogen. The Code of Federal Regulations includes requirements for the post-lethality control of *Listeria* in meat and poultry products. This regulation is referred to as "The *Listeria* Rule," which was enacted in 2003. The rule outlines prevention and control measures that must be taken in processing facilities to reduce the risk of contamination of ready-to-eat products.[6]

29. *Listeria* typically spreads to people through contaminated food or water but can also be transmitted from mother to fetus.

30. Except for the transmission of mother to fetus, human-to-human transmission of *Listeria*

---

[4]      Manning, A. (2019). Microbial Food Spoilage and Food Borne Diseases. In *Food microbiology and food processing* (pp. 125–130). Chapter 2. ED-TECH PRESS.

[5]      Arslan, F., Meynet, E., Sunbul, M. *et al.* The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study. *Eur J Clin Microbiol Infect Dis* 34, 1213–1221 (2015). https://doi.org/10.1007/s10096-015-2346-5

31. is not known to occur. Infection is caused almost exclusively by the ingestion of the bacteria, most often through the consumption of contaminated food. The most widely accepted estimate of foodborne transmission is 85-95% of all *Listeria* cases.

32. The infective dose—that is, the number of bacteria that must be ingested to cause illness—is not known but is suspected to vary based on the strain. In an otherwise healthy person, an extremely large number of *Listeria* bacteria must be ingested to cause illness—estimated to be somewhere between 10-100 million viable bacteria (or colony forming units "CFU") in healthy individuals, and only 0.1-10 million CFU in people at high risk of infection. Even with such a dose, a healthy individual will suffer only a fever, diarrhea, and related gastrointestinal symptoms.

33. The amount of time from infection to the onset of symptoms—typically referred to as the incubation period—can vary to a significant degree.[7]

34. According to the CDC, symptoms of *Listeria* infection can develop at any time from the same day of exposure to 70 days after eating contaminated food. According to the FDA, gastroenteritis (or non-invasive illness) has an onset time of a few hours to 3 days, while invasive illness can have an onset varying from 3 days to 3 months. According to one authoritative text:

> The incubation period for invasive illness is not well established, but evidence from a few cases related to specific ingestions points to 11 to 70 days, with a mean of 31 days. In one report, two pregnant women whose only common exposure was attendance at a party developed *Listeria* bacteremia with the same uncommon enzyme type; incubation periods for illness were 19 and 23 days.

---

[6]       USDA Staff. (2014, January 1). *Controlling Listeria monocytogenes in Post-lethality Exposed Ready-to-Eat Meat and Poultry Products*. https://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/guidelines/2014-0001.

35. Adults can get listeriosis by eating food contaminated with *Listeria*, but babies can be born with listeriosis if their mothers eat contaminated food during pregnancy. The mode of transmission of *Listeria* to the fetus is either transplacental via the maternal bloodstream or ascending from a colonized genital tract. Infections during pregnancy can cause premature delivery, miscarriage, stillbirth, or serious health problems for the newborn. Pregnant women make up around 30% of all infection cases while accounting for 60% of cases involving the 10- to 40-year age group.

36. Several segments of the population are at increased risk and need to be informed so that proper precautions can be taken. The body's defense against *Listeria* is called "cell-mediated immunity" because the success of defending against infection depends on our cells (as opposed to our antibodies), especially lymphocytes, otherwise known as "T-cells." Therefore, individuals whose cell-mediated immunity is suppressed are more susceptible to the devastating effects of listeriosis, including HIV-infected individuals, who have been found to have *Listeria*-related mortality of 29%. The incidence of *Listeria* infection in HIV-positive individuals is higher than in the general population. One study found that:

> The estimated incidence of listeriosis among HIV-infected patients in metropolitan Atlanta was 52 cases per 100,000 patients per year, and among patients with AIDS it was 115 cases per 100,000 patients per year, rates 65-145 times higher than those among the general population. HIV-associated cases occurred in adults who were 29-62 years of age and in postnatal infants who were 2 and 6 months of age.

37. Pregnant women naturally have a depressed cell-mediated immune system. While other systemic bacterial infections may result in adverse pregnancy outcomes at comparable frequencies, *L. monocytogenes* have notoriety because fetal complications largely occur in the absence of overt

---

7       Goulet V, King LA, Vaillant V, de Valk H. What is the incubation period for listeriosis? *BMC Infect Dis*. 2013; 13:11. Published 2013 Jan 10. doi:10.1186/1471-2334-13-11

illness in the mother, delaying medical intervention. In addition, the immune systems of fetuses and newborns are very immature and are extremely susceptible to these types of infections.

38. Other adults, especially transplant recipients and lymphoma patients, are given necessary therapies with the specific intent of depressing T-cells, and these individuals become especially susceptible to *Listeria* as well. Other adults, especially transplant recipients and lymphoma patients, are given necessary therapies with the specific intent of depressing T-cells, and these individuals become especially susceptible to *Listeria* as well.

39. According to the FDA, CDC, and other public health organizations, individuals at increased risk for being infected and becoming seriously ill with *Listeria* include the following groups:

- Pregnant women: They are about 10-20 times more likely than other healthy adults to get listeriosis. About one-third of listeriosis cases happen during pregnancy. Fetuses are also highly susceptible to infection and severe complications.

- Newborns: Newborns can develop life-threatening diseases from perinatal and neonatal infections

- Persons with weakened immune systems

- Persons with cancer, diabetes, kidney, or gastrointestinal disease

- Persons with HIV/AIDS: Individuals with HIV/AIDS are almost 300 times more likely to get listeriosis than people with healthy immune systems.

- Persons who take glucocorticosteroid medications (such as cortisone)

- Persons of advanced age: One risk assessment showed people over 60 years old were 2.6 times more likely to develop listeriosis than the general population. And in 2011, the median age of diagnosed cases in people who were not pregnant was 71 years old.

40. Only a small percentage of persons who ingest *Listeria* fall ill or develop symptoms. For those who do develop symptoms because of their infection, the resulting illness is either mild

or quite severe, in what is sometimes referred to as a "bimodal distribution of severity."[8] *Listeria* can cause two different types of disease syndromes with differing severity. Non-invasive *Listeria* infection causes gastroenteritis with symptoms such as diarrhea, nausea, and vomiting that resolve on their own. Healthy adults without any immunocompromising conditions typically experience this milder version of the disease. The more severe type of disease caused by *Listeria monocytogenes* is called listeriosis and is referred to as an invasive illness.

41.  On the mild end of the spectrum, listeriosis usually consists of the sudden onset of fever, chills, severe headache, vomiting, and other influenza-type symptoms. Along these same lines, the CDC notes that infected individuals may develop fever, muscle aches, and sometimes gastrointestinal symptoms such as nausea or diarrhea. When present, the diarrhea usually lasts 1-4 days (with 42 hours being average), with 12 bowel movements per day at its worst.

42.  The more severe form of the illness occurs when the bacteria infect parts of the body that are typically sterile, such as the blood, brain, liver, and cerebral spinal fluid. The presence of the bacteria in these areas triggers the immune response and can lead to those more severe symptoms. *L. monocytogenes* has a specific affinity for the central nervous system (CNS), especially in cell-mediated immunodeficient individuals.[9]

43.  As already noted, when pregnant, women have a mildly impaired immune system that makes them susceptible to *Listeria* infection. If infected, the illness appears as acute fever, muscle pain, backache, and headache. The illness usually occurs in the third trimester, which is when immunity is at its lowest. Infection during pregnancy can lead to premature labor, miscarriage,

---

[8]      Waldron, C. M. (2017, September 15). *The Recovery and Transfer of Aerosolized Listeria Innocua*. https://vtechworks.lib.vt.edu/handle/10919/78907.

[9]      Arslan, F., Meynet, E., Sunbul, M., Sipahi, O. R., Kurtaran, B., Kaya, S., … Mert, A. (2015, June). *The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study*. European journal of clinical microbiology & infectious diseases: official publication of the European Society of Clinical Microbiology. https://www.ncbi.nlm.nih.gov/pubmed/25698311.

infection of the newborn, or even stillbirth. Around twenty percent of such infections result in stillbirth or neonatal death.

44. Newborns may present clinically with early-onset (less than 7 days) or late-onset forms of infection (7 or more days). Those with the early-onset form are often diagnosed in the first 24 hours of life with septicemia, meningitis, or respiratory distress and have a higher mortality rate. Early-onset listeriosis is most often acquired through trans-placental transmission. Late-onset neonatal listeriosis is less common and less severe than the early-onset form. Clinical symptoms may be subtle and include irritability, fever, poor feeding, and meningitis. The mode of acquisition of late onset listeriosis is poorly understood.

45. For those persons who suffer a *Listeria* infection that does not resolve on its own, the complications can be numerous and possibly severe. The most common complication is septicemia (bacterial infection in the blood), with meningitis being the second most common. Other complications can include inflammation of the brain or brain stem (encephalitis), brain abscess, inflammation of the heart-membrane (endocarditis), septic arthritis, osteomyelitis (infection in the bone), and localized infection, either internally or of the skin.

46. Death is the most severe consequence of listeriosis, and it is tragically common. The CDC has estimated that *L. monocytogenes* is the third leading cause of death from foodborne illness, with approximately 260 of 1,600 people diagnosed dying from their infections. For example, based on 2018 FoodNet surveillance data, 96% of 126 *Listeria* cases ended up in the hospital, the highest hospitalization rate for pathogenic bacterial infection. This data showed a fatality rate of 21%. According to the FDA, the case-fatality rate increases substantially based on complications, possibly reaching rates of 70% in cases with listeria meningitis, 50% in septicemia cases, and over 80% for

perinatal/neonatal infections. In one US study, *L. monocytogenes* was reportedly the cause of nearly 4% of all cases of bacterial meningitis.

**The Decedent's *Listeria* Infection, Illness, and Death**

47. On June 25, 2024, Decedent Linda Dorman consumed Defendant's Liverwurst, which was purchased on June 24, 2024, at Martin's Super Market, located at Rising Sun Town Center #24, Rising Sun, Maryland.

48. On June 27, Decedent began to feel ill with diarrhea and trouble eating.

49. By July 3, 2024, Decedent's condition had worsened, and she was having trouble breathing.

50. On July 4, Decedent's condition had further deteriorated and necessitated transport by ambulance to the emergency department at ChristianaCare Christiana Hospital where she was hospitalized, tested positive for *Listeria*, fell into a coma, and then died on July 6, 2024.

51. It was confirmed by the Pennsylvania Department of Health that Decedent *Listeria* culture was a WGS match to the outbreak strain, and her death was noted as a death related to Defendant's outbreak.

52. Decedent's injuries and death were caused in part by Defendant's tainted food.

53. As a further direct result of being sickened by Defendant's defective food product, Decedent incurred substantial medical bills and expenses associated with the treatment of her injuries; and suffered significant pain, emotional anguish, and other damages, entitling her, directly and through her estate, compensatory and punitive damages for these harms and losses and all other damages recoverable under the Commonwealth of Virginia's Survival Act Statute, VA. CODE § 8.01-25, *et seq*.

54. As a further direct result of Defendant's defective food product, Decedent's surviving

wrongful-death beneficiary, Earl Dorman, suffered the loss of his spouse; the loss of comfort, love, and guidance from his spouse; the loss of services, protection, care, and assistance expected to be performed by his spouse; extreme mental anguish, emotional pain, and grief; and financial expenses associated with the death of Linda Dorman, entitling him to compensatory and punitive damages for these harms and losses and any and all other damages recoverable under the Commonwealth of Virginia's Wrongful Death Statute, VA. CODE § 8.01-50.

### COUNT I
**(Negligence/Gross Negligence/Recklessness/Failure to Warn/Negligence *Per Se*)**

55. Plaintiff repeats and realleges the prior allegations as fully set forth herein.

56. At all relevant times, Defendant was engaged in the business of manufacturing, distributing, supplying and introducing into the stream of commerce food products intended for human consumption.

57. Defendant had a duty to Decedent and others to avoid manufacturing, distributing, supplying, and introducing into the stream of commerce contaminated food, including liverwurst. Defendant breached this duty.

58. Defendant owed a duty to Decedent and others to use supplies and raw materials that complied with federal, state, and local food laws, ordinances, and regulations, including without limitation the statutes in Code of Virginia Title 3.2, Subtitle IV, Chapter 51, Articles 1-3; that were safe and reliable sources; that were clean, wholesome, and free from adulteration; and that were safe for human consumption and for their intended purposes.  Defendant breached this duty.

59. Defendant owed a duty to Decedent and others to use reasonable care in the selection, supervision, and monitoring of its employees, suppliers, or other subcontractors.  Defendant breached this duty.

60. Defendant owed a duty to Decedent and others to use reasonable care in the handling,

manufacture, storage, and distribution of its meat products, to keep them free of contamination with *Listeria*. Defendant breached this duty.

61. Furthermore, at all relevant times, Defendant had actual and constructive knowledge that its food was contaminated and that consuming it would be extremely dangerous to consumers.

62. At all relevant times, Defendant knew or had reason to know that the presence of *Listeria* bacteria in the food was not obvious to or readily discoverable by Decedent.

63. At all relevant times, Defendant had a duty to warn Decedent and others that its food was contaminated, or likely contaminated, with *Listeria*. Defendant breached this duty in that Defendant did not warn Decedent that its food was contaminated, or likely contaminated, with *Listeria*.

64. The food that Defendant manufactured, sold, distributed, and supplied was unmerchantable as to Decedent, and Defendant knew that at the time it sold, distributed, and supplied the product for Decedent's consumption that it was unmerchantable, but failed to warn Decedent and others of this fact.

65. Defendant's actions as described herein were grossly negligent, reckless, and constituted utter and wanton disregard for Decedent rights and safety.

66. Virginia Code § 3.2-5126 prohibits the manufacture, sale, delivery, and offering or sale of adulterated food.

67. Virginia Code § 3.2-5126 prohibits the dissemination of any false advertisement in connection with food.

68. Virginia Code § 3.2-5126 prohibits the giving of a guaranty or undertaking concerning a food, which guaranty or undertaking is false.

69. Decedent was a member of the class of people for whose protection Virginia Code § 3.2-5126 and Title 3.2, Chapter 31, Article 3 of the Virginia Code were enacted.

70. By manufacturing, distributing, supplying, and selling food that was adulterated with

*Listeria* and was poisonous to Decedent, Defendant violated Virginia Code § 3.2-5126; accordingly Defendant is negligent *per se*.

71. As a result of Defendant's negligent, gross negligent, reckless, and willful breaches of duties and noncompliance with applicable law and safety regulations, it manufactured, distributed, and sold food products that were not reasonably safe, and, as a proximate result, it caused Decedent to suffer severe personal injuries, as well as economic loss; caused her to suffer bodily pain and mental anguish; caused her to suffer pain of body and mind; caused her to incur medical and related expenses; directly and proximately caused her untimely death, and has caused her to suffer other damages.

72. As a further direct result of Defendant's negligent, gross negligent, reckless, and willful breaches of duties and noncompliance with applicable law and safety regulations, it manufactured, distributed, and sold food products that were not reasonably safe, and, as a proximate result, it caused Decedent's surviving wrongful-death beneficiary to suffer the loss of his spouse; the loss of comfort, love, and guidance from his spouse; the loss of services, protection, care, and assistance expected to be performed by his spouse; extreme mental anguish, emotional pain, and grief; and financial expenses associated with the death of Linda Dorman.

## COUNT II
### (Breach of Express Warranty)

73. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

74. Defendant is a manufacturer, distributor, supplier, and seller of deli-meat food products and the components thereof. Defendant, through its manufacture, distribution, supply, and sale of deli-meat food products, expressly warranted that its products were reasonably safe for their ordinary and foreseeable purpose (*i.e.*, consumption).

75. Defendant was the manufacturer, distributor, supplier, and seller of the deli-meat food

product consumed by Decedent that caused Decedent's exposure to *Listeria* infection.

76.  Defendant did not disclaim any warranties.

77. To the contrary, Defendant marketed its deli-meat products, expressly promising that they were healthy and safe for consumption.

78. Decedent Linda Dorman was a consumer.

79. The deli-meat products manufactured, supplied, and sold by Defendant were contaminated with *Listeria,* a potentially fatal pathogen.  As such, the deli-meat food products were unreasonably dangerous for their ordinary and foreseeable use.

80. The deli-meat food products were contaminated with *Listeria* when they left the possession and control of Defendant and were subsequently consumed by Decedent.

81. Defendant breached the warranty of the safety of its goods for their expected and foreseeable purpose. This breach was the direct and proximate cause of Decedent's personal, economic, and other injuries, as well as the damages suffered by Decedent's surviving wrongful-death beneficiary, as described herein.

### COUNT III
**(Breach of Implied Warranty of Merchantability,
Fitness For a Particular Purpose, and Wholesomeness)**

82. Plaintiff repeats and realleges the prior allegations as fully set forth herein.

83.  Under Virginia Code § 8.2-315, where a seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to furnish suitable goods, there is an implied warranty that the foods shall be merchantable, fit for such purpose, and wholesome.

84.  At the time of sale, a merchant of food for human consumption impliedly warrants that the food is merchantable, fit for a particular purpose (consumption), and wholesome.

85. Defendant was a merchant of food products.

86. The food that Defendant manufactured, distributed, supplied, and sold was not merchantable, fit for Decedent's consumption, or wholesome because it was contaminated by *Listeria*.

87. In manufacturing, distributing, supplying, and selling the contaminated food, Defendant breached the implied warranties as described above.

88. As a direct and proximate result of the breach of implied warranties by Defendant, Decedent was caused to suffer serious injuries and death, bodily pain and mental distress, and pain of body and mind, and further caused her to incur medical and related expenses, and as a further direct and proximate result of the breach of implied warranties by Defendant, Decedent's surviving wrongful-death beneficiary has suffered extreme damages as described herein.

## COUNT IV
### (Breach of Implied Warranty of Merchantability)

89. Plaintiff repeats and realleges the prior allegations as fully set forth herein.

90. Under Virginia Code § 8.2-314, a merchant that sells goods impliedly warrants that the goods are merchantable; *i.e.*, that the goods will pass without objection in the trade under the contract description; that the goods are fit for the ordinary purposes for which such goods are used; and, that the goods are adequately contained, packaged, and labeled as the agreement requires.

91. The food that Defendant manufactured, distributed, supplied, and sold was objectionable because it contained *Listeria*.

92. In manufacturing, distributing, supplying, and selling the contaminated food, Defendant breached the implied warranties as described above.

93. As a direct and proximate result of the breach of implied warranties by Defendant, Decedent was caused to suffer serious injuries and death, bodily pain and mental distress, and pain of body and mind, and further caused her to incur medical and related expenses, and as a further direct and

proximate result of the breach of implied warranties by Defendant, Decedent's surviving wrongful-death beneficiary has suffered extreme damages as described herein.

### COUNT V
**(Virginia Consumer Protection Act)**

94. Plaintiff repeats and realleges the prior allegations as fully set forth herein.

95. At all relevant times, Defendant was a supplier of goods under the Virginia Consumer Protection Act, Virginia Code § 59.1-196, *et seq*.

96. Defendant marketed its deli-meat product, including the liverwurst consumed by Decedent, as safe for consumption and, as the company's slogan states, made with "Ingredients of Trust."

97. At all relevant times, Defendant was engaged in a consumer transaction with Decedent, and Defendant intended Decedent to rely on its representations.

98. The Virginia Consumer Protection Act prohibits a supplier that is engaged in a consumer transaction from misrepresenting that its goods and services have certain characteristics, ingredients, uses, or benefits; mispresenting that its goods and services are of a particular standard or quality; and, using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

99. The deli-meat consumed by Decedent was not safe, nor was it made with "Ingredients of Trust," as they were contaminated with *Listeria*.

100. The Defendant's false and misleading representations to the public concerning its *Listeria*-contaminated products, along with its other breaches as described herein, breached and constituted prohibited practices under the Virginia Consumer Protection Act (VCPA), Virginia Code § 59.1-200.

101. Decedent relied on Defendant's false and misleading representations to the public

concerning their *Listeria*-contaminated products.

102. Defendant's breaches of the VCPA were willful and caused Decedent injuries and death, as well as the damages suffered by the surviving wrongful-death beneficiary.

103. Virginia Code § 59.1-204 permits consumers who are injured by a defendant supplier's willful violation of the Virginia Consumer Protection Act to recover actual damages, and treble damages if the defendant's violation was willful, as well as attorneys' fees and court costs. Accordingly, Plaintiff seeks damages, including treble damages, as well as costs and attorneys' fees under the VCPA against the Defendant.

104. As a direct and proximate result of Defendant's violations of the VCPA, Decedent was caused to suffer serious injuries and death, bodily pain and mental distress, and pain of body and mind, and further caused her to incur medical and related expenses, and as a further direct and proximate result of the breach of implied warranties by Defendant, Decedent's surviving wrongful-death beneficiary has suffered extreme damages as described herein.

## <u>COUNT VI</u>
### (Fraudulent Concealment)

105. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

106. With knowledge of the contamination of its food products with *Listeria* and other contaminants, and even though time is of the essence to avoid infection with *Listeria* when a person is exposed to it, Defendant intentionally concealed and suppressed material facts concerning the adulteration of the food products it manufactured, distributed, supplied, and sold to their customers. Defendant knew its food was adulterated and nonetheless failed to timely disclose this information to the detriment of Decedent and others, who Defendant caused to be infected with *Listeria*. Decedent relied upon Defendant's claim that it responsibly sourced its food and stood behind its slogan, "Ingredients of Trust."

107. Defendant knew for a protracted period that its deli-meat products were contaminated but failed to disclose to the public during that time the fact that the food was adulterated until after many people, including Decedent, became severely injured. By putting profits over people's health, Defendant failed to provide the public with the information it deserved and was entitled to know to avoid consuming the Defendant's contaminated product.

108. Defendant had a duty to immediately disclose that its food products were contaminated given the conditions at the Jarratt plant to allow Decedent and others to avoid consuming the defective products. Defendant breached that duty, proximately causing Decedent's injuries, damages, and untimely death.

109. Defendant had exclusive knowledge of the scope and extent of the contamination of its food products at its Jarratt plant but chose to continue to manufacture, distribute, supply, and sell its adulterated food products and not warn Decedent or other members of the public of the threat of illness from the consumption of its contaminated products.

110. As a direct result of Defendant's concealment and suppression of material facts, Decedent has sustained damages as outlined herein, including without limitation being exposed to *Listeria* and contracting Listeriosis from Defendant's products.

111. As a further direct and proximate result of Defendant's fraudulent concealment and suppression of material facts, Decedent was caused to suffer serious injuries and death, bodily pain and mental distress, and pain of body and mind, and further caused her to incur medical and related expenses, and as a further direct and proximate result of Defendant's fraudulent concealment and suppression of material facts, Decedent's surviving wrongful-death beneficiary has suffered extreme damages as described herein.

## COUNT VII
**(Survival Act)**

112. Plaintiff incorporates by reference the foregoing paragraphs, and further allege that this claim arises under the Virginia Survival Act, Virginia Code § 8.01-25, *et seq*.

113. Decedent's rights of action as set forth above against Defendant survive in favor of Plaintiff, as Administrator and Personal Representative of his Estate, as well as his statutory beneficiaries. As a result of the negligent, grossly negligent, and reckless acts and/or omissions of Defendant, as previously described, Decedent experienced severe pain and suffering, mental and emotional anguish, and other injuries and damages before her untimely, painful, and preventable death, which was caused by Defendant's wrongful conduct, entitling her to compensatory and punitive damages pursuant to the Virginia Survival Act Statute.

## COUNT VIII
**(Wrongful Death)**

114. Plaintiff incorporates by reference the foregoing paragraphs, and further allege that this claim arises under the Commonwealth of Virginia's Wrongful Death Statute, VA Code § 8.01-50.

115. As a direct and proximate result of the negligent, grossly negligent, and reckless and wrongful acts and omissions of Defendant, as previously described, wrongful-death beneficiary Earl Dorman, as the surviving spouse of Linda Dorman (deceased), suffered, and will continue to suffer, the loss of his spouse; the loss of comfort, love, and guidance from her; the loss of services, protection, care, and assistance expected to be performed by her; have suffered, and will continue to suffer, extreme mental anguish, emotional pain, and grief; have incurred financial expenses associated with the death of his spouse; and are entitled to compensatory and punitive damages for these harms and losses and any and all other damages recoverable under the Virginia Wrongful Death Act.

WHEREFORE, Plaintiff Thomas Roberts, Esq., as Administrator and Personal Representative of the Estate of Linda Dorman, deceased, and on behalf of the wrongful-death beneficiary, demands damages against Defendant Boar's Head Provisions Co., Inc. in the sum of TEN MILLION DOLLARS ($10,000,000.00) for compensatory damages, plus pre-judgment interest from June 27, 2024—the date of the injury onset— and costs; punitive damages in the amount of Ten Million Dollars ($10,000,000.00); and an award of attorneys'-fees as may be permitted by law.

**TRIAL BY JURY IS DEMANDED BY PLAINTIFF.**

**THOMAS ROBERTS, ESQ., as Administrator and Personal Representative of the Estate of Linda E. Dorman**

By Counsel

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:     */s/ Emily C. Lagan*
Emily C. Lagan        VSB #93614
elagan@reganfirm.com
Salvatore J. Zambri  (*pro hac vice* to be filed)
szambri@reganfirm.com
1919 M Street, NW, Suite 600
Washington, DC 20036
Pн:    (202) 463-3030
Fx:    (202) 463-0667
*Co-Counsel for Plaintiff*

and

MARLER CLARK, INC., P.S.

William D. Marler  (*pro hac vice to be filed*)
bmarler@marlerclark.com

180 Olympic Drive SE
Bainbridge Island, WA 98110
Pн:    (206) 346-1888
Fx:    (206) 346-1898
*Co-Counsel for Plaintiff*